UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| In Re: <br><br> Diana M. Fouracre <br>             Debtor | | Docket Number: 22-10129 <br> Chapter 13 |
| Diana M. Fouracre <br>             Plaintiff <br> v. <br> Axos Bank <br>          & <br> World Business Lenders, LLC <br>             Defendants | | Adversary Proceeding <br> No.: 23-       Hzp |

**COMPLAINT TO DETERMINE AMOUNT AND VALIDITY OF DEBT AND MORTGAGE LIEN AND OTHER ASSERTED CAUSES OF ACTION**

A. *The Parties*

1. **Defendant Axos Bank ( hereinafter "Axos") is a FDIC chartered financial institution in the State of California and perhaps other States.**

2. **Defendant World Business Lenders, LLC ( hereinafter "WBL") is a financial lending institution and loan servicer who does business with Axos with principal headquarters in California and/or Frisco, Texas and perhaps other States, including Jersey City, NJ.**

3. **Plaintiff Diana Fouracre ( hereinafter "Diana" ) is the Debtor in this case and the Plaintiff in the above -entitled action.**

### B. *Jurisdictional Statement*

4  **This Court has jurisdiction over the adversary proceeding under the provisions of 28 USC § 157.**

5. **This is a core proceeding under 28 U.S.C. § 157 (b)(2)(A), (E) and (O) and 11 USC § 541 and 542.**

6. **Venue in this district is proper pursuant to 28 U.S.C. § 1409(a) because this is the district where the Debtor's Chapter 13 case is pending.**

7. **This proceeding has been brought in accordance with Fed. R. Bankr. P.7001. and the Vermont Local Rules of Bankruptcy Procedure.**

### C. *General Allegations*

8. **Diana filed a Voluntary Chapter 13 in this Court *on September 21, 2022.***

9. **Axos filed a Proof of Claim for $190,120.23 against Diana.**

10. **In its Proof of Claim Axos alleged an *in rem* and *in personam* liability against Diana against her Schedule A homestead real property listed in her bankruptcy petition, and it also alleged a personal liability by virtue of a personal guaranty executed by her in which it apparently identified her as Todd J. Galiano's "spouse.*"***

11. **Diana is not the spouse of Todd J. Galiano.**

12. Diana never executed a personal guaranty in regard to the debt alleged in Axos's Proof of Claim.

13. Any liability, if any, Axos has against Diana is *in rem* only. To the extent Axos's Proof of Claim is alleging an *in personam* liability, that is a false statement.

14. Diana filed an objection to Axos's Proof of Claim based upon multiple grounds on December 13, 2022.

15. Axos and WBL have been accused of predatory lending. It has been the subject of many lawsuits in several States. Axos has been accused of being involved in a Rent-A-Bank Scheme, in which unscrupulous lenders who seek to charge exorbitant interest rates partner with a federally chartered bank to fund their loans, and attempt to avoid state usury limits.

16. Axos has been an eager participant in such schemes — spurring both lawsuits and congressional ire. A 2020 lawsuit against Axos and its partner World Business Lenders accuses the companies of conspiring to sell a mortgage at a staggering 138 percent APR. The litigation accuses Axos and WBL of "willful" and "deceptive acts and practices" that violated "New York's Criminal Usury laws."

17. In this case, the amount allegedly owed by Diana is equally disturbing: on a $40,000 principal loan ( about $35,500 net after fees were taken out ) issued in December 2018, the debt is now allegedly over $190,000 comprising accrued interest of $105,895.26 , a "premium payment" of $9674.08 and "collection fees" of $38,692.77.

18. Diana has no recollection of being given any federal law mandated disclosures indicating how this loan worked or what she could be financially charged in the

event of default. She was not told of any premium payment or collection fees in the event of default.

19. Any such disclosures were not part of Axos's Proof of Claim.

20. Counsel weeks ago reached out to Axos's counsel of record to obtain any TILA Regulation Z disclosures and/or RESPA or HOEPA Disclosures that might have been given to Diana at closing. Axos's counsel stated none would be provided before any lawsuit, thus obstructing due diligence before filing of the lawsuit. .

21. The unusual nature of this transaction was that it was done at night after Todd Galiano had done some research on the internet in regard to getting a quick business loan to make payroll for Galiano Construction.

22. Someone from World Business Lenders ,LLC , apparently acting as agent or servicer of Axos Bank, then reached out to Todd Galiano.  Hard sell tactics were employed, with this agent telling Todd Galiano if you put your house up as collateral more favorable terms could be given. These more favorable terms were never spelled out to Todd or Diana, nor given.  The next thing Todd and Diana know is that a lawyer for Axos and WBL shows up at their home at night , parks himself at the kitchen table, and says if they want this loan, these documents need to be signed. Sign or else was the impression that was given . Todd and Diana were not even sure who this person was - apparently Axos's lawyer -  or what his precise role was. Diana and Todd were never told to obtain legal advice before signing and they did not consult a lawyer or have a lawyer present with them., even though they were asked to put their house up as additional collateral to what was once a purely

secured business loan to Galiano Construction. It was a very strange hurry up, hush hush, better- sign- now- type -loan or else, no money. None of the onerous terms of this loan was explained to Todd or Diana by this lawyer who sat at their table.

23. Diana was never part of these discussions at the kitchen table. She never talked with Axos or WBL before or after the loan was made. She was only asked to sign the mortgage deed at her kitchen table at nighttime in front of the Axos/WBL lawyer. At no time before or after the signing of the mortgage deed did Diana receive any Regulation Z documents, Good Faith estimate, HOEPA docs, HUD-1 or any information regarding the terms of this loan, as required by federal law. Except for the lawyer who asked her to sign that mortgage deed, she had no direct contact with Axos or WBL.

D. *Count 1 - Defective Proof of Claim*

24. Paragraphs 1 through 23 are herein incorporated by reference.

25. Axos's Proof of Claim alleges an *in personam* liability against Diana.

26. No documents were presented with the Proof of Claim to establish any in personal liability or a personal guaranty.

27. The Proof of Claim is invalid as to any personal liability of Diana's.

28. Because of the lack of RESPA, TILA, HOEPA disclosures given to Diana, she owes no money to Axos and WBL, and the mortgage deed also should therefore be invalidated.

### E. *Count 2 - Unjust Enrichment*

29. Paragraphs 1 through 23 are herein incorporated by reference.

30. Unjust enrichment sounds in equity. To support a claim for unjust enrichment, Diana must show that: (1) a benefit was conferred on defendants; (2) defendants accepted that benefit; and (3) it would be inequitable for defendant not to compensate plaintiff for the value of the benefit.

31. The elements for unjust enrichment exist in this case. Defendants were conferred a benefit far beyond what in consideration could be deemed reasonable by the exorbitant interest , the prepayment penalty, the up-front fees of about 12% reducing the loan to about $35,500 ( Todd and Diana thought they would be get getting $40,0000 net ) and the outrageous collection fees that were never explained, plus taking a secured interest in Diana's real property.

32. For Diana to have pay almost a 500% increase on an original $40,000 debt and potentially lose her property is pellucidly inequitable and does not compensate Diana for the value of the benefit that she received.

### F. *Count 3 - Unconscionable  Contract*

33. Paragraphs 1 though 31 are herein incorporated by reference.

34. There terms of the loan shock the conscience. If these terms are not predatory and outrageous for a consumer like Diana, that begs the questions: short of loan sharking, What terms could be? Prepayment penalty, collection fees, up-front fees reducing the net proceeds , outrageous interest, a 500 percent increase in the debt in 48 months based upon an original disbursement of about $35,500.

35. Th substantive terms of the contract are unreasonably and oppressively favorable to Axos/WBL, the more powerful partners in the transaction, and then lending to a desperate homeowner with no lawyer present but the lawyer of the Defendants present, in an at-night transaction, no copies or disclosures provided , as set forth in §21-23, *supra*, show the pressure and unequal bargaining power and the desperation Diana was under, making the loan oppressive, unfair, and unconscionable.

36. Because of the oppressive, predatory, and unfair terms of the loan contract as already set forth, the loan and mortgage should be voided .

### G. *Count 4 - Violation of the Vermont Consumer Protection Act*

37. Paragraphs 1-36 are herein incorporated by reference.

38. In addition, under the VCPA it Is an unfair and deceptive act and practice in commerce for processor, other than a federally insured depository institution, to process check, draft, or to issue a negotiable instrument, or an electronic funds transfer from a consumer's financial account in connection with loan solicited or made by any means to consumer unless the lender is in compliance with all provisions of V.S.A. chapter 73 or is otherwise exempt from the requirements of V.S.A. chapter 73. Finally, consistent with V.S.A. § 2215(d)(1), "[a]ny contract of loan made in knowing and willful violation of subdivision 2201(a)(1) of this title shall be void and the lender shall have no right to collect or receive any principal, interest, or charges whatsoever." V.S.A. 2215(d)(1).

39. The Defendants as alleged herein, individually or through their agents, violated

**Vermont law by: (1) soliciting loans without-a license; (2) making loans based on unlicensed loan solicitations; (3) making loans without license;** and **(4) processing loan payments for loans that were not in compliance with "all provisions of V.S.A, chapter 73." As remedy for Defendants' unlawful conduct, Plaintiffs seek treble damages for Defendants' violations of the VCPA and declaratory judgment that the loan made by Defendants to Diana are void because the loans were made knowingly and willfully in violation of V.S.A. 2201(a)(1**).§l

40. **Axos and WBL are alleged alleged herein, individually, together, or through their agents, violated Vermont law by: (1) soliciting loans without-a license; (2) making loans based on unlicensed loan solicitations; (3) making loans without license; and (4) processing loan payments for loans that were not in compliance with "all provisions of V.S.A, chapter 73." As remedy for Defendants' unlawful conduct, Diana seek treble damages for Defendants' violations of the VCPA and declaratory judgment that all loans made by Defendants to Diana are void because tlie loans were made knowingly and willfully in violation of V.S.A. 2201(a)(1).§l**

41. World Business Lenders LLC ("WBL") solicits loans through advertisements, paper mailings, telephone calls, and other communication to Vermont businesses on behalf of Axos .

42. WBL did not at the time the loan was made to Diana have a license to solicit loans in Vermont.

43. Upon information and belief, WBL is aware of Vermont license requirement, but knowingly and willfully refuses to obtain solicitation license at the time of the loan

to Diana.

44. **Loans made by Axos - even though and FDIC institution - through unlicensed loan solicitations by a servcier third parties such as WBL violate Vermont law because loan solicitation company or its agent is subject to ongoing monitoring, E-training, and compliance programs by the FDIC-insured bank Axos in this case, to manage loan solicitation company WBL and to assure compliance with regulations, which was not done by Axos here.**

45. **Axos, an FDIC insured institution, is not required to obtain lender license but it is required to oversee WBL in the solicitation process.**

46. **Upon information and belief, WBL is (a) subject to ongoing monitoring, training, and compliance programs by Axos to manage the activities of the WBL; and (b) subject to supervision under Loan Solicitation Licensing Requirement of V.S.A. Chapter 73.**

47. **Axos, based on loan solicitation by WBL, required Diana to pay $1,940 in processing fees and $2,429.74 in "adjustments," $40,000 in December 2018. The terms of the loan required resulting in loan disbursement of $35,630.26.**

48. **Repayment of the loan was to occur over period of 35 weeks, with weekly payments of $1,374.29 for total repayment of $53,604.**

49. **The effective interest rate on the December 2018 Axos loan was in excess of 85%.**

50. **Upon information and belief, Axos and WBL made the loan to Diana knowingly and willfully in violation of Vermont's loan solicitation licensing requirements.**

51. **At all times relevant , WBL acted as the processor for Axos's loan to Diana . Upon information and belief, WBL processed weekly electronic funds transfers from**

Diana or Galiano Construction as repayment for loans that were solicited and made to Diana under violation of Vermont law.

52. WBL violated the VCPA by soliciting loans to Diana without Vermont loan solicitation license.

53. Axos violated the VCPA by lending money to Diana as result of an unlawful loan solicitation by WBL. .

54. WBL violated the VCPA by processing electronic funds transfers to repay the unlawful loan Axos made to Diana.

55. Axos and WBL knowingly and willfully disregarded Vermont's loan solicitation/lender license requirements when loaning money Diana, all in violation of the VCPA.

### H. Count 4 -Violation of TILA and RESPA and HOEPA

56. Paragraphis 1 through 55 are herein incorporated by reference.

57. Liability Under TILA, RESPA and Consumer Protection Acts are to ensure compliance with complex state and federal statutes to avoid significant statutory damages. The Truth-in-Lending Act ("TILA"), Title I of the Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq., was enacted to promote the informed use of consumer credit by requiring disclosures to consumers about its terms and costs. Generally, TILA applies to each individual or business that offers or extends credit when: (1) the credit is offered or extended to consumers; (2) the credit is subject to a finance charge or is payable by a written agreement in more than four installments; (3) the credit is primarily for personal, family or household purposes;

and (4) the loan balance equals or exceeds $25,000.00 or is secured by an interest in real property or a dwelling.

58. As envisioned, TILA was intended to enable a borrower to compare the cost of a cash versus credit transaction and to discover the difference in the cost of credit among different lenders. The regulation requires a maximum interest rate to be stated in any variable rate contract secured by the borrower's dwelling, imposes limitations on home equity plans that are subject to the requirements of certain sections of the Act, and requires a maximum interest that may apply during the term of a mortgage loan. TILA also establishes disclosure standards for advertisements that refer to certain credit terms.

59. In addition to financial disclosure, TILA provides borrowers with substantive rights in connection with certain types of credit transactions to which it relates, including a right of rescission in certain real estate lending transactions. While TILA also regulates certain credit card practices and provides a means for resolution of credit billing disputes, our discussion will be limited to those provisions of TILA that relate specifically to the mortgage lending process, namely: (1) Early and Final Regulation Z Disclosure Requirements (Part B); (2) Right of Rescission (Part B); and (3) TILA's Enforcement Provisions.

60. TILA requires lenders to make certain "material disclosures" on loans subject to the Real Estate Settlement Procedures Act (RESPA) within three business days after their receipt of a written application. This early disclosure statement is partially based on the initial information provided by the consumer.

61. The term "material disclosures" means the disclosure of the annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, the due dates or periods of payments scheduled to repay the indebtedness, and the disclosures required by Section 1639(a) of this title.

62. A final disclosure statement is provided at the time of loan closing. The disclosure is required to be in a specific format. While the "annual percentage rate" and the "finance charge" are to be disclosed more conspicuously than other terms, the Disclosure typically includes much information concerning the lender, the loan and its terms.

63. Under TILA, a consumer has the right of rescission as to certain transactions. In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership is or will be subject to the security interest has the right to rescind the transaction.

64. Lenders are required to deliver two copies of the notice of the right to rescind and one copy of the disclosure statement to each consumer entitled to rescind. The notice: must be on a separate document that identifies the rescission period on the transaction; and must clearly and conspicuously disclose the retention or acquisition of a security interest in the consumer's principal dwelling;

notice of right to rescind; or (3) delivery of all "material disclosures", whichever occurs last. When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective for all consumers.

65. Any consumer harmed by a violation of TILA may bring a civil suit against the lender. Generally, TILA provides for the following civil remedies: (1) actual damages; (2) damages twice the amount of any finance charge in connection with the transaction; (3) damages not less than $200 or greater than $2,000; and (4) Reasonable Attorney Fees. 15 U.S.C. § 1640(a).

66. The Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 1261 et seq. is a consumer protection statute, first passed in 1974. RESPA was enacted in order to (1) help consumers become better shoppers for settlement services and (2) eliminate kickbacks and referral fees that unnecessarily increase the costs of certain settlement services. To accomplish these ends, RESPA requires that borrowers receive disclosures at various times. In addition, RESPA prohibits certain practices that increase the cost of settlement services. It also prohibits home sellers from requiring home buyers to purchase title insurance from a particular company.

67. Transactions which involve a "federally related mortgage loan" fall under RESPA and must comply with those rules. As a practical matter, "federally related mortgage loans" include virtually all loans which are secured by a lien on residential property, regardless of lien position. Examples include a refinance, equity lines of credit, reverse mortgages, and home improvement loans. Any transaction that does not

involve a "federally related mortgage loan," such as a cash sale or a loan primarily for business or agricultural purposes is exempt from RESPA. [For a full definition of "federally related mortgage loan," see 12 U.S.C. § 2602(1) and 24 C.F.R. 3500.2].

68.     RESPA Disclosures required.

(1) Disclosure At The Time Of Loan Application: Good Faith Estimate of Settlement Costs

When borrowers apply for a mortgage loan, RESPA requires mortgage brokers and/or lenders to give the borrowers:

(2) a Special Information Booklet, which contains consumer information regarding various real estate settlement services. (Required for purchase transactions only).
a Good Faith Estimate (GFE) of settlement costs, which lists the charges the buyer is likely to pay at settlement. This is only an estimate and the actual charges may differ. If a lender requires the borrower to use a particular settlement provider, then the lender must disclose this requirement on the GFE.a Mortgage Servicing Disclosure Statement, which discloses to the borrower whether the lender intends to service the loan or transfer it to another lender. This Statement also provides information about complaint resolution.

69. The Home Ownership and Equity Protection Act of 1994 (HOEPA) amended TILA by adding Section 129 of TILA, 15 U.S.C. § 1639, and has been implemented by Sections 226.31 and 226.32 of Regulation Z. 12 C.F.R. §§ 226.31 and 226.32. HOEPA was implemented to specifically curb the predatory lending practices of certain sub-prime lenders. Generally, the Act provides added protections to borrowers who obtain more high-cost loans in the sub-prime market.

70. HOEPA applies where "the total point and fees payable by the consumer at or before the closing will exceed the greater of -- (i) 8 percent of the total loan amount; or (ii) $400." 15 U.S.C. § 1602 (aa)(1)(B). Generally, points and fees include all items included in the finance charge, all compensation paid to mortgage brokers, and all enumerated section 1605(e) charges.

71. If the total points and fees exceed the greater of 8 percent or $400, section 1604 of the Act requires additional disclosures. These specific HOEPA disclosures are enumerated in section 1639(a)-(b) of TILA. Where inadequate disclosure occurs, the borrower has the right of recision. 15 U.S.C. § 1635.

72. Upon information and belief Axos and WBL provided none of the disclosures under RESPA, TILA or HOEPA were given to Diana before the loan was made or after, and, as regards HOEPA fees deducted from the principal loan balanced exceeded the 8% Rule requiring the enhanced HOEPA disclosures.

      I. *Count 5 -Violation of Vermont Deceptive Trade Practices Laws*

73. Paragraphs 1 though 72 are herein incoporated by refernce

73. **Vermont Deceptive Trade Practices Laws Deceptive trade practices and acts in the State of Vermont are dealt under Title Nine (Commerce and Trade), Chapter 63 (Consumer Fraud), Subchapter 1 (General Provisions) of Vermont Statutes.  Section 2453 of this Subchapter prohibits any unfair methods of competition and unfair or deceptive acts or practices in commerce.  This Section declares false advertisements as prohibited and unlawful.**

74. **By the authority of Section 2461, any consumer who sustains damages or injury as a result of any false or fraudulent practice prohibited under the provisions of this section is entitled to recover equitable relief, actual damages, reasonable attorney fees, and exemplary damages not exceeding three times the value of the consideration given by the consumer.**

75. **Practices prohibited; antitrust and consumer fraud**

    **(a) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are hereby declared unlawful.**

    **(b) It is the intent of the legislature that in construing subsection (a) of this section, the courts of this state will be guided by the construction of similar terms contained in Section 5(a)(1) of the Federal Trade Commission Act as from time to time amended by the Federal Trade Commission and the courts of the United States.**

.

**76.** (a) Any person who violates the terms of an injunction issued under section 2458 of this title shall forfeit and pay to the state a civil penalty of not more than $ 10,000.00 for each violation. For the purposes of this section, the court issuing such injunction shall retain jurisdiction, and the cause shall be continued, and in such cases the attorney general or a state's attorney acting in the name of the state may petition for recovery of such civil penalty.

(b) Any consumer who contracts for goods or services in reliance upon false or fraudulent representations or practices prohibited by section 2453 of this title, or who sustains damages or injury as a result of any false or fraudulent representations or practices prohibited by section 2453 of this title, or prohibited by any rule or regulation made pursuant to section 2453 of this title may sue for appropriate equitable relief and may sue and recover from the seller, solicitor or other violator the amount of his damages, or the consideration or the value of the consideration given by the consumer, reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by the consumer. Any language, written or oral, used by a seller or solicitor, which attempts to exclude or modify recovery of the penalty or reasonable attorney's fees shall be unenforceable.

(c) Any person alleged to have violated the terms of subsection (b) of this section shall be entitled to a trial by jury, unless waived according to law.

66. WBL and Axos engaged in unfair and deceptive trade practices as to Diana by giving her an exorbitant loan without making any required disclosures, without forewarning, the unconscionable terms of the loan, not disclosing to her the penalties and interest and collection fees attached to this loan, causing a $35,000 plus/minus loan disbursement to turn into an almost $200,000 debt within 48 months, by giving to her an unconscionable loan with ruining terms exposing her home to foreclosure and loss, and by not complying with RESPA, TILA and HOEPA. Wherefore, Diana prays for the following :

### J. *Prayer for Relief With Jury Demand*

1. A Trial by Jury, if permitted;

2. Damages , and treble damages, as permitted under the respective laws, for violation of each Cause of Action set forth in the Counts alleged;

3. Punitive damages for the outrageous nature of Axos's and WBL's conduct and for the knowing and willful violation of the applicable laws;

4. Rescission of the mortgage loan and note and any guaranty, if permitted under the law;

5. That the Proof of Claim filed by Axos be declared invalid and the Objection to it upheld.

6. For any other relief this Court deems proper and just, including attorney's fees and other costs.

**Dated at Colchester, Vermont this January 28, 2023.**

**/s/ Todd Taylor, attorney for Diana Fouracre , Plaintiff**